1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                          CENTRAL DISTRICT OF CALIFORNIA
10
11   DIAMONDSTAR ENTERTAINMENT            Case No. 8:21-cv-01150-KES
12   HOLDINGS, LLC,
13              Plaintiff,                FINDINGS OF FACT AND
                                          CONCLUSIONS OF LAW
14        v.
15   THH, LLC, et al.,
16              Defendants.
17
18
19                                   **I.**
20                              **INTRODUCTION**
21        In mid-2020, during the height of the COVID-19 pandemic, Diamondstar
22   Entertainment Holdings, LLC ("Plaintiff") purchased disinfectant wipes from THH,
23   LLC ("THH"), which Plaintiff planned to resell to its own customers.  Plaintiff
24   claims that the wipes were unusable, and it brings claims for breach of contract,
25   breach of the implied covenant of good faith and fair dealing, breach of express and
26   implied warranties, unfair competition under California Business and Professions
27   Code section 17220, and negligent interference with contractual relationships.
28

1    (Dkt. 62 at 3-4 [Final Pretrial Conference Order].)[1]

2          Plaintiff filed this action in state court against Defendant THH and its owner,

3    Rick Zielomski ("Zielomski") (collectively, "Defendants").  (Dkt. 1-3.)  Defendants

4    later removed the action to this Court based on diversity jurisdiction.  (Dkt. 1, 10);

5    see generally 28 U.S.C. § 1332.  The parties consented to the jurisdiction of the

6    undersigned Magistrate Judge.  (Dkt. 6); see generally 28 U.S.C. § 636(c)(1).

7          The case proceeded through discovery, and no party moved for summary

8    judgment.  In preparation for trial, the parties stipulated to certain facts, which the

9    Court accepted and recited in its Final Pretrial Conference Order.  (Dkt. 62 at 2-3

10   ¶ 5.)  A bench trial was held before the undersigned on August 2, 3, and 4, 2022.

11   (Dkt. 64-66 [minutes], Dkt. 76-78 [transcripts].)  On September 13, 2022, the

12   parties submitted written briefs in lieu of closing argument.  (Dkt. 82 ["Defendants'

13   Closing Brief"], Dkt. 83 ["Plaintiff's Closing Brief"].)  Accordingly, the case is

14   now ripe for decision.

15         After considering the evidence, briefs, and arguments of counsel, the Court

16   makes the following findings of fact and conclusions of law.[2]  Plaintiff is entitled to

17   judgment against Defendant THH on the claims for breach of contract and breach

18   of the implied warranty of merchantability.  However, the only reasonably certain

19   damages that Plaintiff has proven by a preponderance of the evidence are the

20   purchase price ($42,568) and cover damages ($7,000).  Plaintiff has failed to show

21   it is entitled to relief on any of its other claims.

22

23

24

---

25         [1] Plaintiff also brought a claim for rescission but withdrew the claim after trial.  (Dkt. 83
     at 12 [Plaintiff's Closing Brief].)

26

27         [2] Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion
     of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding
     of fact.

28

2

## II.

## UNDISPUTED FACTS

In May 2020, Plaintiff began negotiating with Defendant Zielomski, owner of Defendant THH, for the purchase of disinfectant wipes.  (Stip. Facts / Dkt. 62 at 3.)  Plaintiff's owner, Aric Gastwirth, was introduced to Defendant Zielomski by a man named Dominic Moscato, who "facilitated the purchase" and was paid a commission by Defendant Zielomski.  (Trial Day 1 at 134-36, 140 [Moscato's testimony]; see also Trial Day 1 at 17-18 [Gastwirth's testimony].)

Defendant Zielomski provided Plaintiff with a Safety Data Sheet ("SDS") for the disinfectant wipes stating that the product was safe.  (Stip. Facts / Dkt. 62 at 2.)  The SDS had Defendant Zielomski's name on it.  (Id.)[3]

The wipes were not manufactured by Defendant THH; Defendant THH purchased them from another company called Luca's Dog Food, which was owned by Michael Balano.  (Trial Ex. 2 [purchase order between Luca's Dog Food and Defendant THH]; Trial Day 2 at 48-49 [Zielomski testimony]; Trial Day 3 at 6-7 [Balano testimony].)

On May 22, 2020, Plaintiff and Defendant THH entered into a contract in the form of a purchase order.  (Stip. Facts / Dkt. 62 at 2; Trial Ex. 1 [purchase order between Plaintiff and Defendant THH].)  On May 23, 2020, Defendant THH sent Plaintiff an invoice for 10,016 thirty-count containers of Outlaw Brand Disinfectant Wipes for a price of $4.25 each.  (Stip. Facts / Dkt. 62 at 2; Trial Ex. 3 [the invoice].)  Plaintiff paid a total of $42,568 for the 10,016 containers.  (Stip. Facts / Dkt. 62 at 2.)

Plaintiff intended to buy the disinfectant wipes to sell to a customer, Safeguard.  (Id.)  Safeguard was then to provide the disinfectant wipes to Haas

---

[3] There are several SDS's in the record.  (Trial Ex. 7, 44.)  The parties' Stipulated Facts do not specify which exhibit is the referenced SDS.

1   Automation, Inc. and KB Home.  (Id.)  Though Safeguard was a customer of

2   Plaintiff, this was a test order for Haas Automation, Inc. and KB Home, who

3   intended to continue ordering from Plaintiff through Safeguard if they were

4   satisfied with the products.  (Id.)

5         Pursuant to the contract between Plaintiff and Defendant THH, the 10,016

6   containers of wipes were to be shipped to Ft. Lauderdale, Florida, on May 27 or

7   May 28, 2020, in care of Plaintiff, for its customers.  (Id.)  They were shipped to a

8   warehouse in Florida that was operated by a warehouse and distribution company

9   called J.M. Field.  (Trial Day 1 at 21-22 [Gastwirth's testimony].)

10        Once the wipes were delivered, Plaintiff discovered, through its customers,

11  that several of the 10,016 cases of wipes received from Defendants contained mold

12  and were unusable.  (Stip. Facts / Dkt. 62 at 3.)  Plaintiff requested a full refund of

13  the entire shipment.  (Id.)  Defendants refused to respond to Plaintiff's demands to

14  rescind the agreement and return the $42,568 paid by Plaintiff for the 10,016 cases

15  of Outlaw Brand Disinfectant Wipes.  (Id.)  Defendants refused because they

16  claimed they were not manufacturers of the wipes, but only brokered the purchase.

17  (Id.)

18        Because the disinfectant wipes purchased by Plaintiff for its customers did

19  not meet specifications and were moldy and unusable, Plaintiff was forced to pay

20  its customers an additional $7,000, which was the additional amount its customers

21  (through Safeguard) had to pay in order to purchase quality disinfectant wipes.

22  (Id.)

23                                    **III.**

24              **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

25        This action is in federal court based on diversity jurisdiction under 28 U.S.C.

26  § 1332.  (Dkt. 10 [amended notice of removal].)  The parties' contract, a one-page

27  purchase order, does not contain a choice-of-law provision.  (Trial Ex. 1.)  This

28  Court applies the substantive law of the forum state of California, including its

                                        4

1    choice-of-law rules.  See generally Muldoon v. Tropitone Furniture Co., 1 F.3d

2    964, 966 (9th Cir. 1993) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)).

3    The parties agree that California law governs the interpretation of the contract's

4    terms.  See generally Cal. Civ. Code § 1646 ("A contract is to be interpreted

5    according to the law and usage of the place where it is to be performed; or, if it does

6    not indicate a place of performance, according to the law and usage of the place

7    where it is made."); Madera Grp., LLC v. Mitsui Sumitomo Ins. USA, Inc., 545 F.

8    Supp. 3d 820, 831 (C.D. Cal. 2021).

9           Neither party's briefing explicitly discusses whether the contract is governed

10   by California common law or the UCC as adopted in California.  (See, e.g., Pl.

11   Closing Br. at 5-6 [citing case law discussing both types of contracts].)  However,

12   the UCC and common law do not appear to differ materially as to the issues and

13   arguments raised by the parties.

14   **A.    Breach of Contract and the Implied Warranty of Merchantability.**

15          **1.    Applicable Law.**

16                 a.    Breach of Contract.

17          To prevail on a breach of contract claim under California law, a plaintiff

18   must prove: (1) the existence of a contract; (2) plaintiff's performance or excuse for

19   nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of

20   the breach.  CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (2008).

21   Contracts for the sale of goods are governed by the California Uniform Commercial

22   Code.  Cal. Com. Code §§ 2102, 2106.  "Goods … are 'conforming' or conform to

23   the contract when they are in accordance with the obligations under the contract."

24   Cal. Com. Code § 2106(2).

25                 b.    Implied Warranty of Merchantability.

26          "[A] warranty that the goods shall be merchantable is implied in a contract

27   for their sale if the seller is a merchant with respect to goods of that kind."  Cal.

28   Com. Code § 2314(1).  To be "merchantable," goods must be, among other things,

"fit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(b). Thus, this "implied warranty 'provides for a minimum level of quality'" and a breach "occurs if the product lacks 'even the most basic degree of fitness for ordinary use.'" Birdsong v. Apple, Inc., 590 F.3d 955, 958 (9th Cir. 2009) (quoting Am. Suzuki Motor Corp. v. Superior Court, 37 Cal. App. 4th 1291, 1296 (1995) and Mocek v. Alfa Leisure, Inc., 114 Cal. App. 4th 402, 406 (2003)). "Under California Commercial Code section 2314, … a plaintiff asserting breach of [the implied] warranty [of merchantability] claims must stand in vertical contractual privity with the defendant." Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1023 (9th Cir. 2008); see also In re ConAgra Foods, Inc., 90 F. Supp. 3d 919, 986 (C.D. Cal. 2015) (noting that "the exception to privity available for breach of express warranty claims is not available for breach of implied warranty claims"), aff'd sub nom. Briseno v. ConAgra Foods, Inc., 674 F. App'x 654 (9th Cir. 2017) and 844 F.3d 1121 (9th Cir. 2017).

"A buyer who is damaged by a breach of implied warranty has two possible measures of those damages: one where the buyer has rightfully rejected or 'justifiably revoked acceptance' of the goods … , and one where the buyer has accepted the goods…." Simgel Co. v. Jaguar Land Rover N. Am., LLC, 55 Cal. App. 5th 305, 315-16 (2020) (citing Cal. Com. Code §§ 2711, 2714). "A buyer who has accepted goods may revoke acceptance of a commercial unit 'whose nonconformity substantially impairs its value to him.'" Id. (quoting Cal. Com. Code § 2608(1)).

If the buyer rejects or revokes a prior acceptance of the goods, the buyer "may 'recover[ ] so much of the price as has been paid,' among other remedies…." Id. at 316 (quoting Cal. Com. Code § 2711(1)). In addition to the purchase price, "the buyer may 'cover' by making in good faith and without unreasonable delay any purchase of … goods in substitution for those due from the seller," and then the "recover from the seller as damages the difference between the cost of cover and

the contract price…."  Cal. Com. Code § 2712(1)-(2).  The buyer may also recover incidental and consequential damages, id. § 2712(2), which are defined as follows:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include
>
> > (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> >
> > (b) Injury to person or property proximately resulting from any breach of warranty.

Cal. Com. Code § 2715.

Where the buyer accepts the goods—rather than rejecting them or revoking acceptance—"the measure of damages for breach of warranty 'is the difference ... between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount' … and incidental and consequential damages also may be recovered…."  Simgel Co., 55 Cal. App. 5th at 316 (quoting Cal. Com. Code § 2714).

**2.**      **Plaintiff Had a Contract With Defendant THH But Not With Defendant Zielomski.**

The parties stipulated that Plaintiff and Defendant THH entered into a contract in the form of a Purchase Order.  (Stip. Facts / Dkt. 62 at 2; Trial Ex. 1 [the purchase order].)

Plaintiff argues that Defendant Zielomski should also be personally liable for breach of contract under a "pierc[ing] the corporate veil" theory, arguing that: (a) "there were no corporate formalities followed with regard to the role of Michael Balano and/or Lucas Dog Food"; (b) "proper records" were not kept; and (c) it would be "inequitable" for Defendant Zielomski "to escape liability."  (Pl. Closing Br. at 16-17.)  Plaintiff cites evidence purportedly showing that Defendant Zielomski made Plaintiff believe that Defendant THH, rather than Michael Balano or Luca's Dog Food, was the manufacturer of the wipes.  (Id., citing Ex. 44 [SDS listing TH as the "manufacturer/ supplier"]; Ex. 6 [text message from Moscato to Defendant Zielomski stating, "you listed yourself as the manufacturer in the paperwork and also on the MSDS [sic]"]; Trial Day 2 at 63-67 [testimony of Defendant Zielomski about whether he represented that Defendant THH was the manufacturer on the SDS].)

Under California law, the piercing the corporate veil or alter-ego doctrine "is an extreme remedy, sparingly used."  Sonora Diamond Corp. v. Superior Ct., 83 Cal. App. 4th 523, 539 (2000).  The California Court of Appeal has summarized the doctrine as follows:

> The circumstances of an individual case determine whether the court will pierce the corporate veil and regard the corporation as the alter ego of its shareholders. … "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist.  Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." … Factors for the trial court to consider include the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and

8

1    officers, and use of one as a mere shell or conduit for the affairs of the

2    other.  "No one characteristic governs, but the courts must look at all

3    the circumstances to determine whether the doctrine should be

4    applied." …

5         [The issue is whether] to disregard the corporate entity as a

6    distinct defendant and to hold the alter ego individuals liable on the

7    obligations of the corporation where the corporate form is being used

8    by the individuals to escape personal liability, sanction a fraud, or

9    promote injustice.

10   Shaoxing Cnty. Huayue Imp. & Exp. v. Bhaumik, 191 Cal. App. 4th 1189, 1198

11   (2011) (citations omitted).

12        Plaintiff has not shown that it is entitled to prevail on this theory for two

13   reasons.  First, this theory was not pled in the Complaint.  (Dkt. 10-3.)  District

14   courts in the Ninth Circuit disagree about which pleading standard applies to alter

15   ego liability: either the heightened pleading standard for fraud allegations under

16   Federal Rule of Civil Procedure 9(b) or the more liberal standard in Rule 8.

17   Risinger v. SOC LLC, 936 F. Supp. 2d 1235, 1242 n.2 (D. Nev. 2013) ("Whether

18   Rule 9(b) applies to pleadings of alter ego liability has been the subject of debate in

19   district courts nationwide."); Wimbledon Fund v. Graybox, LLC, No. 15-cv-6633-

20   CAS-AJWx, 2016 WL 7444709 at *5, 2016 U.S. Dist. LEXIS 192161 at *17 (C.D.

21   Cal. Aug. 31, 2016) (finding that "a majority of courts in this Circuit have found

22   that plaintiffs must satisfy Rule 9(b)'s particularity standard as to the fraud element

23   of plaintiff's alter ego theory").  Yet even courts that apply the less stringent

24   standard require that the theory be pled in the complaint and supported with factual

25   allegations.  See, e.g., Neilson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101,

26   1116 (C.D. Cal. 2003) ("Conclusory allegations of 'alter ego' status are insufficient

27   to state a claim.  Rather, a plaintiff must allege specifically both of the elements of

28   alter ego liability, as well as facts supporting each."); Dakavia Mgmt. Corp. v.

9

1   <u>Bigelow</u>, No. 20-cv-00448, 2022 WL 104245 at *5, 2022 U.S. Dist. LEXIS 4894 at

2   *12 (E.D. Cal. Jan. 10, 2022) ("Although the pleading requirements for alter-ego

3   liability are 'not so strict,' … a plaintiff must allege more than legal conclusions.")

4   (citation omitted).

5        In <u>Wady v. Provident Life and Accident Insurance Co. of America</u>, 216 F.

6   Supp. 2d 1060 (C.D. Cal. 2002), for example, the court found that the plaintiff

7   could not raise an alter ego theory as a defense to summary judgment because the

8   theory was not raised in the complaint, reasoning as follows:

9        [N]one [of the complaint's allegations] contains any reference to

10       UnumProvident being the alter ego of Provident.  None alleges that

11       UnumProvident treats the assets of Provident as its own, that it

12       commingles funds with Provident, that it controls the finances of

13       Provident, that it shares officers or directors with Provident, that

14       Provident is undercapitalized, or that the separateness of the

15       subsidiary has ceased.  Without such allegations, the issue is not

16       adequately raised, and UnumProvident was not put on notice that this

17       was a theory against which it should be prepared to defend.

18   <u>Id.</u> at 1067.  Similarly, the Complaint in this case contains no allegations of alter

19   ego. (Dkt. 10-3.)  It does not allege the relationship between Defendant Zielomski

20   and Defendant THH, but simply alleges on information and belief that all

21   Defendants "were the agents, employees, officers, principals, subsidiaries, parent

22   company, affiliated companies and/or representatives of each of the remaining

23   Defendants…." (<u>Id.</u> at ¶ 5.)  The Complaint also alleges that it entered a contract or

24   agreement with "Defendants," without specifying that it was seeking to hold

25   Defendant Zielomski liable under an alter ego theory.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> at ¶¶ 21, 31,

26   56.)  Accordingly, the Complaint did not put Defendant Zielomski on notice that

27   this was a theory against which he should be prepared to defend.

28        Second, Plaintiff has pointed to no evidence that would support piercing the

1    corporate veil of Defendant THH to hold Defendant Zielomski liable for a breach of

2    Plaintiff's contract with Defendant THH.  It is irrelevant whether or not formalities

3    were followed or adequate records kept between Defendant THH and Luca's Dog

4    Food; Plaintiff is not seeking to hold Luca's Dog Food liable on the contract.  The

5    issue is whether Defendant Zielomski treated Defendant THH as his personal alter

6    ego, such that Defendant THH's acts should be considered Defendant Zielomski's

7    acts.  Even if Defendant Zielomski did misrepresent that Defendant THH rather

8    than Lucas Dog Food was the manufacturer of the wipes (which the Court is not

9    finding), this is not the type of inequity that would support piercing the corporate

10   veil, as it does not show that "the corporate form" of Defendant THH was "used by

11   [Defendant Zielomski] to escape personal liability, sanction a fraud, or promote

12   injustice."  Shaoxing, 191 Cal. App. 4th at 1198.  For example, Plaintiff has not

13   introduced any evidence suggesting that Defendant Zielomski formed Defendant

14   THH for the purpose of concealing the identity of the true manufacturer.  (Cf. Trial

15   Day 2 at 108 [Defendant Zielomski's testimony that he had been "in the business of

16   selling somebody else's product to a third party" for "[a]pproximately 23, 24

17   years"]; Trial Day 1 at 134-36 [Dominic Moscato's testimony that he had done

18   business with Defendant Zielomski in 2018].)

19          Accordingly, the Court finds that only Defendant THH can be held liable for

20   breach of the contract or the implied warranty of merchantability.

21          **3.      Defendant THH is a Merchant With Respect to Goods of This**

22                   **Kind.**

23          As noted above, to be liable for a breach of the implied warranty of

24   merchantability, the seller must be "a merchant with respect to goods of that kind."

25   Cal. Com. Code § 2314(1).  A merchant "means a person who deals in goods of the

26   kind or otherwise by his occupation holds himself out as having knowledge or skill

27   peculiar to the practices or goods involved in the transaction or to whom such

28   knowledge or skill may be attributed by his employment of an agent or broker or

other intermediary who by his occupation holds himself out as having such knowledge or skill." Cal. Com. Code § 2104(1). "A person making an isolated sale of goods is not a 'merchant' within the meaning of the full scope of this section and, thus, no warranty of merchantability would apply." U.C.C. § 2-314, Comment 3; see also Arriaga v. CitiCapital Com. Corp., 167 Cal. App. 4th 1527, 1542 (2008) (rejecting the plaintiff's argument that, "as a lessor of industrial machinery that occasionally sells items that have reverted to it, CitiCapital" was "a merchant with respect to such industrial machinery"; finding that CitiCapital was "not a merchant with respect to industrial machinery," but rather "a finance lessor," and "the product a finance lessor deals in is money, not industrial equipment").

Although Mr. Zielomski testified that Defendant THH's business was primarily CBD products (Trial Day 2 at 39-40), he also testified that, since the beginning of the COVID-19 pandemic, he had worked on approximately 100 or 200 transactions involving personal protective equipment ("PPE"). (Trial Day 2 at 111.) He estimated that, between May and August of 2020, he participated in approximately 10 phone conversations a day about PPE sales. (Id. at 112.) He also offered testimony about whether certain business practices were common or uncommon "in the PPE space." (See, e.g., id. at 107.) Disinfectant wipes are reasonably considered part of the PPE industry. This is sufficient to show that Defendant THH was a merchant with respect to the goods of this kind, especially as Defendant does not appear to dispute this element. (See Defs. Closing Br. at 12-13 [in the section dealing with the implied warranty of merchantability, arguing only that Plaintiff "failed to mitigate or prove its damages"]; Dkt. 10-8 [Defendants' answer, not raising this issue]; Dkt. 62 [Final Pretrial Order, not raising this issue].)

### 4.    Plaintiff Performed Under the Contract.

Defendants argue that Plaintiff failed to perform under the contract because Defendant Zielomski testified that an entity called "Run It Up, Inc.," not Plaintiff, "was the entity that actually paid for the goods." (Defs. Closing Br. at 5, 8; Trial

1    Day 2 at 38, 114.)

2          However, the fact that Plaintiff paid for the wipes was stipulated in the

3    parties' proposed Final Pretrial Conference Order (Dkt. 42-1) and approved by the

4    undersigned in the Final Pretrial Conference Order (Dkt. 62 at 2). Stipulations are

5    "binding … when filed in the proceeding" and "approved by the judge…." Central

6    District of California Local Rule 7-1. "Litigants, [the Supreme Court has] long

7    recognized, '[a]re entitled to have [their] case tried upon the assumption that ...

8    facts, stipulated into the record, were established.'" Christian Legal Soc. Chapter

9    of the Univ. of California, Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 676

10   (2010) (quoting H. Hackfeld & Co. v. United States, 197 U.S. 442, 447 (1905)).

11         To the extent Defendants complain that the information about which entity

12   paid for the wipes "was not provided to the Defendants during discovery" (Defs.

13   Closing Br. at 5), they cannot demonstrate prejudice, because Defendant

14   Zielomski's trial testimony shows that which entity paid for the wipes was a fact

15   within his personal knowledge at the time of the transaction. Moreover, Plaintiff's

16   owner Aric Gastwirth testified that he owns Run It Up, LLC and repaid that entity

17   out of Plaintiff's funds. (Trial Day 1 at 107, 127-28.)[4]

18   _____

19         [4] Defendants argue that Plaintiff "failed to join an indispensable party" under Federal Rule
     of Civil Procedure 19, i.e., Run It Up, Inc., because "[w]hile Gastwirth orally claimed that he

20   owned and repaid" Run It Up, Inc. for the wipes, he "failed to provide any primary written
     evidence that Plaintiff actually paid for or owns the goods," in violation of the "best evidence"

21   rules, Federal Rules of Evidence 1002 and 1004. (Defs. Closing Br. at 5-8.)

22         Defendants did not raise a best evidence objection to Mr. Gastwirth's trial testimony.
     (See Trial Day 1 at 107, 127-28.) Moreover, Mr. Gastwirth's testimony was not offered to prove

23   the content of a writing within the meaning of these rules. See Fed. R. Civ. P. 1002 ("An original
     writing … is required in order to prove its content….") (emphasis added). "The 'best evidence'

24   rule, embodied in Fed. R. Evid. 1002, comes into play only when the Terms of a Writing are
     being established…. The rule is not applicable when a witness testifies from Personal knowledge

25   of the matter, even though the same information is contained in a writing." D'Angelo v. United
     States, 456 F. Supp. 127, 131 (D. Del. 1978), aff'd, 605 F.2d 1194 and 605 F.2d 1197 (3d Cir.

26   1979); compare Fireman's Fund Ins. Co. v. Stites, 258 F.3d 1016, 1023 (9th Cir. 2001) ("the
     checks and billing records the Insurers submitted were not offered to prove 'the content of a

27   writing' as required by the" best evidence rule) with Medina v. Multaler, Inc., 547 F. Supp. 2d
     1099, 1122 (C.D. Cal. 2007) (the plaintiff's "references to the content of emails she received,"

28

1     Accordingly, the Court finds that Plaintiff performed its obligations under the

2    contract with Defendant THH by paying for the wipes.

3         **5.**      **Defendant THH Breached the Contract and the Implied Warranty**

4              **of Merchantability.**

5     Plaintiff argues that Defendant THH breached the contract and the implied

6    warranty of merchantability by "fail[ing] to provide [Plaintiff] with usable

7    disinfectant wipes," arguing that the wipes "were moldy and unfit for human use."

8    (Pl. Closing Br. at 5, 9.)  Defendants argue there was no breach of any "express"

9    contractual term (Defs. Closing Br. at 9), and that as to the other claims, "Plaintiff

10   has failed to establish any reasonable certainty as to the actual damages for which

11   the Defendant THH should be liable, as so much of the product was uninspected

12   and … unaccounted for after [being] received by Plaintiff's clients."  (Id. at 12.)

13   Citing the testimony of Michael Balano, the owner of manufacturer Luca's Dog

14   Food, Defendants argue, "[T]he manufacturer did attempt to replace the goods that

15   the Plaintiff claimed were defective by shipping replacement boxes, but … Plaintiff

16   refused to accept the shipment…. [T]he goods that the Plaintiff received were

17   saleable, and upon their return, were, in fact, sold without complaint by" Mr.

18   Balano and/or Luca's Dog Food.  (Id.)  Defendants argue, "There was no evidence

19   presented that there were any defects in [the] replacement sanitary wipes," and "it is

20   impossible to determine from the evidence offered by the Plaintiff how many of the

21   units were inspected, returned without inspection, found usable or unusable."  (Id.

22   at 13.)

23     Although Plaintiff has not demonstrated the breach of any express term—

24   given that the parties' contract was a one-page purchase order with very few

25   express terms—Plaintiff has shown that Defendants breached the implied term that

26   the wipes be "fit for the ordinary purposes for which such goods are used."  Cal.

27

28   allegedly showing pregnancy discrimination, "violate the best evidence rule").

1    Com. Code § 2314(2)(b).  Although the exact numbers of usable and unusable

2    wipes are unclear, the evidence shows that enough of the wipes were unusable to

3    justify Plaintiff rejecting the goods or revoking its acceptance of the goods.  See

4    Cal. Civ. Code § 1794(b)(1) (describing damages for breach of an implied warranty

5    "[w]here the buyer has rightfully rejected or justifiably revoked acceptance of the

6    goods"); see generally Cal. Com. Code § 2602 (manner and effect of rightful

7    rejection); id. at § 2608 (revocation of acceptance in whole or in part).

8          The parties stipulated that "several of the 10,016 cases of wipes received

9    from Defendants contained mold and were unusable."  (Stip. Facts / Dkt. 62 at 3.)

10   Matthew Kraft, an account coordinator at J.M. Field, testified about his personal

11   observations of the wipes that arrived at J.M. Field's warehouse as follows:

12          A lot of it was kind of tossed around.  I mean, we have pictures

13          of a couple of them that are just – they're not even, like, palletized.  It

14          looks like it's just kind of like on a pallet.  They're all smashed.

15          A lot of them after opening and reviewing them were either, A,

16          completely dry and had no sanitizer contents in them; or if they did,

17          they -- most of it had some type of mold on them which we could tell

18          just from the black specks directly on the wipes just from opening it.

19          There was also just no seal or anything on the product either.

20                                         …

21          [W]e did weigh some of them.  … [W]e weighed them because

22          … a lot of the packages, when we opened it, there's no liquid or

23          sanitizer in the contents.  So just off the bat when we were just

24          comparing a couple, we could tell whether or not there was even any

25          liquid in some of these canisters.  Some of them were not even useful

26          because of that also.

27          There was also the issue with the mold, but also there was no

28          usable contents in there.  It was just sheets of paper basically.

1                                             . . .

2              We noticed obviously there was physical visual damages on a

3         lot of these canisters.  Then we noticed a huge weight difference in a

4         couple of them.  So because of that and because of visually seeing the

5         damages, we had no choice but to open the canisters just to see how

6         far the damages were and how far the issues were with the -- with this

7         product that just came in.  It was obviously worse than we would have

8         expected.

9   (Trial Day 2 at 9-12.)  When asked whether there were "any wipes or canisters of

10  wipes that appeared like they were usable," Mr. Kraft responded:

11             [I]n my opinion there were some usable wipes, which I do believe that

12        we relayed.  But I would say the very vast majority we had issues

13        with, and we were not able to use most of the inventory, as I had said.

14        Just the majority that we had to go through and weigh, they either had

15        no contents in it or there was mold in the contents.  So, yes, there's

16        not -- there wasn't many or very many that we could use for any

17        orders.

18  (Id. at 20-21.)  He also testified that, to the best of his recollection, none of the

19  wipes were used to fulfill orders for customers; they were either shipped back to the

20  manufacturer or thrown away.  (Id. at 21.)

21             Similarly, Mr. Moscato testified about problems J.M. Field reported with the

22  wipes as follows:

23             [T]he first problems that were brought up to my attention was

24        how the boxes arrived.  They appeared to be damaged.  The boxes

25        were damaged.  They were just in beat-up condition.

26             The issue is also that they were not palletized how they were

27        stated, how Rick [Zielomski] stated that they were going to arrive.  So

28        the count, it was difficult to get a proper count in how they were

                                              16

palletized.  From there, there was a – I believe that they mentioned

that the weight on some of the products were not consistent, which led

them to believe that they were dried out, which was the case.

A lot of the products -- and I don't know the amount or how

many, that some were -- a good portion of them were dry, and then

later to find out that upon further inspection, that there was [sic] mold

spots on some of them.

(Trial Day 1 at 138-39.)  Contemporaneous emails corroborate Mr. Kraft's and Mr.

Moscato's testimony about the condition of the wipes.  (See, e.g., Trial Ex. 17, 23

[emails discussing how the number of units and cases per pallet did not match the

bill of lading sent by Defendant THH, and attaching photos].)

Defendants argue that "the pallets and products" Mr. Kraft was describing

above "were returned to the manufacturer, and replaced with a new shipment," and

although Mr. Kraft "testified that the replacement pallets 'still had some issues' …

there is no evidence that [Mr. Kraft or J.M. Field] did any thorough investigation or

examination of these replacement shipments."  (Defs. Closing Br. at 12.)  The

Court does not interpret Mr. Kraft's testimony as describing only the first shipment

of wipes, and other evidence indicates that later shipments suffered from similar

problems.  Mr. Gastwirth testified that, while he and Defendant Zielomski were

discussing how to fix the problems with the first shipment, "there was a problem

with the next shipment that showed up also."  (Trial Day 1 at 38; see also Trial Ex.

31 [June 19, 2020 email from Mr. Gastwirth to Defendant Zielomski stating, "This

is a HUGE problem as I fulfilled my other large order from this stockpile.  We are

talking costing me 100k's of business with my 2 largest clients.  Please let me know

your thoughts."][5]; Trial Ex. 17 [emails from Mr. Kraft showing that the first

---

[5] This exhibit, along with others, was initially the subject of a hearsay objection and admitted only for its effect on the listener, but Defendants later withdrew their hearsay objections. (Trial Day 3 at 22.)

1    shipment was received at the J.M. Field warehouse on or about June 2, 2020].)  Mr.

2    Gastwirth also testified that 512 units that Defendant THH shipped directly to

3    Plaintiff's customer Haas Automation (rather than to the J.M. Field warehouse)

4    were rejected by Haas.  (Trial Day 1 at 125 ["[Haas] looked at them.  They didn't

5    want them.  They told me to take them back."]; id. at 113-14 [Gastwirth's

6    testimony that an order to KB Home or Haas Automotive "was picked up from the

7    client when it was deemed that they didn't want them"].)

8         Defendants argue that Mr. Kraft testified that "there were at least two good

9    pallets of merchandise."  (Defs. Closing Br. at 12.)  Mr. Kraft's testimony about

10   "two good pallets" was quoting an email Mr. Kraft sent Mr. Gastwirth on June 5,

11   2020, shortly after a shipment of wipes arrived.  (Trial Day 2 at 16-18.)  The email

12   was part of a chain in which Mr. Kraft was reporting that the boxes of wipes were

13   damaged, and that the number of wipes per pallet did not correspond with

14   paperwork provided by Defendant THH.  Mr. Kraft stated:

15        We still need a confirmation of the inventory that was just delivered.

16        Can you please give us a quantity of the inventory that was just sent

17        here out of the 2 good pallets that are not damaged?  If you are not

18        sure, we can physically count this inventory if you would like.

19   (Trial Ex. 23 at THH000095.)  This email indicates that the boxes on those two

20   pallets did not appear to be damaged on first visual inspection, but it does not

21   indicate that the wipes in that shipment were useable.  The other defects mentioned

22   by Mr. Kraft and Mr. Moscato, i.e., dryness and mold, did not become apparent

23   until further inspection.

24        Defendants also cite a bill of lading indicating that five pallets of wipes were

25   shipped to KB Home in San Ramon, California on or about June 9, 2020.  (Defs.

26   Closing Br. at 12; Trial Ex. 23 at THH000117.)  Although neither Mr. Gastwirth

27   nor Mr. Kraft remembered this specific shipment, Mr. Gastwirth agreed that either

28   this shipment or another shipment was rejected by KB Home, not because the wipes

18

were found to be defective, but because it was delivered to an office address rather than a warehouse address.  (Trial Day 2 at 25-28 [Kraft testimony]; Trial Day 1 at 112-15 [Gastwirth testimony].)  However, there is no evidence that Plaintiff sold these wipes to KB Home for a profit.  Emails between Mr. Gastwirth and Defendant Zielomski discussing this bill of lading indicate that the parties arranged for Defendants or their agents to pick up this shipment.  (Trial Ex. 35 [emails dated June 23 and 24, 2020].)  In light of the other evidence about defects across multiple shipments of the wipes, the evidence does not tend to show that these wipes were usable merely because KB Home rejected them for a different reason before attempting to use them.  At that point, Plaintiff was entitled to reject the goods based on the defects that had already been discovered.  (See Trial Day 1 at 97 [Gastwirth's testimony that, by mid-June 2020, he became "concerned that potentially the ones that [Plaintiff] sent out [to its customers], since we didn't inspect every one of them before they went out, could have gone out with the same problems"]).

Finally, to the extent Defendants rely on the testimony of Michael Balano, owner of manufacturer Luca's Dog Food, to establish that the wipes were not defective, the Court does not find his testimony credible.  Mr. Balano testified that the only problem he recalled with the wipes was that "the courier had tipped a pallet over," and that when his team inspected the wipes that were returned to Luca's Dog Food, "they were all perfect."  (Trial Day 3 at 8-9.)  The assertion that "all" of the wipes were "perfect" is not credible in light of Mr. Kraft and Mr. Moscato's testimony and contemporaneous emails, including photographs.  Moreover, unlike those witnesses, Mr. Balano is not a disinterested party to these proceedings. Defendants have filed a lawsuit against Mr. Balano in the U.S. District Court for the Western District of Missouri for claims arising out of this same transaction. (Trial Day 3 at 17 [Balano's trial testimony]; see also Dkt. 28 [order denying Defendants' motion to transfer this action to Missouri]); THH, LLC, et al. v. MJB

19

1   Worldwide, LLC, et al., No. 4:22-cv-00017-GAF (W.D. Mo. Jan. 12, 2022) (date

2   complaint filed).[6]  Mr. Balano therefore has a financial motive to assert that the

3   wipes were not defective.

4           Overall, Defendants have not rebutted the testimony by Mr. Gastwirth and

5   Mr. Kraft that Plaintiff was unable to fulfill any customer orders from the wipes

6   that Defendant THH sold to Plaintiff.  (Trial Day 2 at 21, 72-73, 109-10.)  Through

7   the credible testimony of Mr. Kraft, Plaintiff has established more probably than

8   not that the "vast majority" of the wipes were not fit for ordinary use, such that

9   Defendant THH violated the implied warranty of merchantability.

10          **6.**      **Plaintiff Was Damaged as a Result of the Breach.**

11               a.      Plaintiff did not fail to mitigate its damages.

12          Defendants argue, "While the Plaintiff has introduced some evidence of

13   damaged product, there has been no clear demonstrable evidence of how much of

14   the product was unacceptable, [and] what efforts, if any, Plaintiff took to mitigate

15   its damages…."  (Defs. Closing Br. at 24.)  Defendants further argue that Plaintiff

16   "had a duty to mitigate, but when offered replacement goods, [Plaintiff] didn't even

17   both to inspect or try and mitigate their damages."  (Id. at 10.)[7]

18          Defendants' argument seems to be that, once J.M. Field observed the initial

19   problems with some containers of wipes, Plaintiff should have directed J.M. Field

20   to open and inspect every container to determine exactly how many were usable.  In

21   support of their mitigation argument, Defendants cite the following language from

22   Agam v. Gavra, 236 Cal. App. 4th 91 (2015):

23          The doctrine of mitigation of damages holds that "[a] plaintiff who

24          suffers damage as a result of … a breach of contract … has a duty to

---

26      [6] As of the date of this order, the Missouri case remains pending.  See THH, No. 4:22-cv-00017-GAF, Dkt. 16 (April 2022 scheduling order setting trial for June 2023).

27

28      [7] Plaintiff's closing brief does not discuss this issue.

take *reasonable* steps to mitigate those damages and will not be able
to recover for any losses which could have been thus avoided.' " …
Under the doctrine, "[a] plaintiff may not recover for damages
avoidable through ordinary care and reasonable exertion." …
However, "[t]he duty to mitigate damages *does not require an injured
party to do what is unreasonable or impracticable*."

Id. at 111 (emphasis added; citations omitted).

In the present case, inspecting every container of wipes would have been
unreasonable and impracticable.  Mr. Kraft's testimony indicates that J.M. Field did
inspect many of the wipes, and Mr. Gastwirth testified that he did not have J.M.
Field inventory all of them because J.M. Field would have charged Plaintiff $40 per
hour to do so.  (Trial Day 1 at 46-48.)  Incurring these additional expenses to
inspect every single container of wipes actually would have *increased* Plaintiff's
potential damages.  See Cal. Com. Code § 2715(1) ("Incidental damages resulting
from the seller's breach include expenses reasonably incurred in inspection … of
goods rightfully rejected…."); id. at § 2513(2) ("Expenses of inspection must be
borne by the buyer but may be recovered from the seller if the goods do not
conform and are rejected."); see also Unif. Com. Code § 2513 (Buyer's Right to
Inspection of Goods, Comment 4, "Expenses of an inspection made to satisfy the
buyer of the seller's performance must be assumed by the buyer in the first
instance. … Where the buyer would normally bear the expenses of the inspection
but the goods are rightly rejected because of what the inspection reveals,
demonstrable and reasonable costs of the inspection are part of his incidental
damage caused by the seller's breach.").  Defendants have not shown that J.M.
Field's inspection of the wipes on Plaintiff's behalf was commercially
unreasonable, or that Plaintiff unreasonably rejected the wipes.  See Cal. Com.
Code § 2513(1) ("the buyer has a right before payment or acceptance to inspect [the
goods] at any reasonable place and time and in any reasonable manner"); 4 Cal.

21

Transactions Forms--Bus. Transactions § 24:354 ("[I]t is not necessary that the buyer select the most appropriate time, place, or manner to inspect or that the selection be the customary one in the trade or locality.  Any reasonable time, place, or manner is available to the buyer and the reasonableness will be determined by trade usages, past practices between the parties and the other circumstances of the case.")

In sum, Defendants have not shown that Plaintiff failed to mitigate its damages, such that it should be barred from recovering on its claims.

> b.      Plaintiff is entitled to damages for the $42,568 purchase price
> and the $7,000 it paid for replacement goods.

As discussed above, where the seller has breached the implied warranty of merchantability and the buyer has rightfully rejected or justifiably revoked acceptance of the goods, the buyer may recover the purchase price, cover damages, and incidental and consequential damages.  See Simgel Co., 55 Cal. App. 5th at 315-16; Cal. Com. Code §§ 2711, 2712, 2715.  "A buyer who has accepted goods may revoke acceptance of a commercial unit 'whose nonconformity substantially impairs its value to him.'"  Simgel Co., 55 Cal. App. at 316 (quoting Cal. Com. Code § 2608(1)).  Here, the Court finds, Plaintiff justifiably revoked its prior acceptance of the wipes once the problems were discovered.  Mr. Gastwirth testified that, when J.M. Field first discovered the problems, he and Mr. Zielomski initially discussed whether and when replacement wipes could be provided.  (Trial Day 1 at 37-55; Trial Ex. 16, 19-23 [emails].)  Mr. Gastwirth also spoke with Mr. Balano of Luca's Dog Food, the manufacturer of the wipes, who "indicated that he had a cash flow problem that would potentially prohibit him from fixing the issue."  (Trial Day 1 at 66.)  Eventually, Mr. Gastwirth testified, "We got to the point where we could not in our opinion in good faith use the disinfectant wipes that we had to fulfill the orders.  I let Mr. Zielomski know and he could come pick it [sic] up and refund our money … for what we had paid for the wipes."  (Id. at 75.)  By June 23,

22

1  2020, emails show the parties were making arrangements for Defendants or Luca's
2  Dog Food to pick up the wipes.  (See, e.g., Trial Ex. 33, 34.)

3       Defendants nevertheless argue that Plaintiff cannot recover damages because,
4  "While the Plaintiff has introduced some evidence of damaged product, there has
5  been no clear demonstrable evidence of … exactly what damages the Plaintiff
6  suffered in the present or future."  (Dkt. 82 at 24.)  They cite Cal. Civ. Code section
7  3301, which provides, "No damages can be recovered for a breach of contract
8  which are not clearly ascertainable in both their nature and origin."

9       Plaintiff has shown damages in the form of the purchase price of $42,568.
10  (See Trial Ex. 1 [purchase order between Defendant THH and Plaintiff]; Trial Ex. 3
11  [invoice from Defendant THH to Plaintiff]; Stip. Facts / Dkt. 62 at 2 ["Plaintiff paid
12  a total of $42,568 for the 10,016 containers."].)

13       Plaintiff is also entitled to recover the $7,000 it paid its customers to obtain
14  replacement goods.  (Id. at 3 ["Because the disinfectant wipes purchased by
15  Plaintiff for its customers did not meet specifications and were moldy and unusable,
16  Plaintiff was forced to pay its customers an additional $7,000, which was the
17  additional amount its customers (through Safeguard) had to pay in order to
18  purchase quality disinfectant wipes."]; Trial Day 1 at 73 [Gastwirth's testimony that
19  Plaintiff paid Safeguard "an extra $7,000 to cover the cost differential" for the new
20  wipes]); see Canesco, 570 F. Supp. 3d at 892 ("Under Section 2712 of the
21  Commercial Code, Plaintiff would have, in addition to his right to recover the
22  purchase price, the right to 'cover,' or purchase substitute goods without
23  unreasonable delay and recover as damages the difference between the cost of
24  cover and the contract price plus any incidental or consequential damages minus
25  expenses saved in consequence of the breach."); Cal. Civ. Code § 1794(b)(1); Cal.
26  Com. Code §§ 2711(1), 2712(2).

27       To the extent Plaintiff is seeking other types of damages, however, those
28  have not been proven with sufficient particularity, as discussed further below.

1                      c.      Plaintiff did not prove the amount of expenses it incurred in

2                                inspecting the wipes.

3       Plaintiff argues it is entitled to "reimbursement of its expenses incurred in

4 inspecting the products (at $40 per hour)…."  (Pl. Closing Br. at 15.)  Mr.

5 Gastwirth did testify that this was J.M. Field's hourly rate for "stuff outside of

6 normal just warehousing."  (Trial Day 1 at 46-47.)  But Plaintiff did not present any

7 evidence about how many hours J.M. Field expended or charged to Plaintiff.  (See

8 id. at 47-48 [Gastwirth's testimony that he did not have J.M. Field "go through the

9 product" because he was trying to avoid these extra costs]; id. at 49 [Gastwirth's

10 testimony that he had J.M. Field do "a physical count of how many [wipes] were

11 actually on hand at that time," but he did not state how many hours J.M. Field

12 expended or how much Plaintiff was billed or paid].)  Accordingly, Plaintiff has not

13 introduced any evidence quantifying the amount of these damages.

14                      d.      Plaintiff's lost profits damages are too speculative.

15       Plaintiff seeks "$698,645 (or some portion thereof) in damages for its lost

16 profits" as "special damages."  (Pl. Closing Br. at 15.)  Defendants argue, "The only

17 exhibit Plaintiff introduced" in support of its lost profits argument "was Exhibit 46,

18 which comprises of a number of alleged claims of profits allegedly made by some

19 other companies for unknown activities….  Any damages to which the Plaintiff

20 testified [sic] were purely speculative."  (Defs. Closing Br. at 20.)

21       A buyer may recover lost profits under the California Commercial Code

22 under some circumstances.  See Cal. Com. Code § 2715 (buyer's incidental and

23 consequential damages); R.B. Matthews, Inc. v. Transamerica Transp. Servs., Inc.,

24 945 F.2d 269, 274-75 (9th Cir. 1991) ("Consequential damages are those damages

25 which did not arise within the scope of [the buyer's] transactions with [the seller],

26 but which stemmed in a foreseeable way from losses incurred by [the buyer] as a

27 result of [the seller's] breach. … The profits that [the buyer] lost from its resale of

28 the refurbished trailers are one form of consequential damages.").  Lost profits may

only "be recovered if the evidence shows with reasonable certainty both their occurrence and the extent thereof." Gerwin v. Se. Cal. Assn. of Seventh Day Adventists, 14 Cal. App. 3d 209, 221 (1971) (capitalization removed). "[I]f a business is new," it may be "improper to award damage for loss of profits because absence of income and expense experience renders anticipated profits too speculative to meet the legal standard of reasonable certainty necessary to support an award of such damage." Id.; see also Sargon Enterprises, Inc. v. Univ. of S. California, 55 Cal. 4th 747, 773-74 (2012) ("[T]he general principle [is] that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.") (citation omitted).

The only evidence Plaintiff offered in support of its claim to lost profits is the testimony of Mr. Gastwirth and Exhibit 46, a chart Mr. Gastwirth prepared, which he described as "a 12-month projection of revenue generated from the three main channels that [Plaintiff] had potential distribution and sales set up for … the wipes." (Trial Day 1 at 85.) These three channels were KB Home, Haas Automation, and Amazon. Per the chart, Mr. Gastwirth estimated that orders from KB Home and Haas Automation would have more than tripled in June 2020 and risen steadily by 500 units or more for each of the following months through May 2021. (Trial Ex. 46.) Mr. Gastwirth testified that the estimated "number of units sold were derived … as a function of speaking with Ira [Fineman[8]] at Safeguard about what he was ultimately able to move in quantities and supplies available at the time and what [Plaintiff] could have done if the availability of wipes to meet these units was [sic] available…." (Id. at 87.) Regarding Amazon, Mr. Gastwirth testified that Plaintiff was "putting together a package" to sell on Amazon, which was "a kit consisting of

---

[8] Mr. Gastwirth testified that Ira Fineman was "a rep that goes out and solicits business on [Safeguard's] behalf and has his own clients that he brings in and gets paid on … commissions, I guess…. He was also working with [Mr. Gastwirth] at [Plaintiff] as the salesperson." (Trial Day 1 at 79.)

a box of masks, two bottles of sanitizer, and a thing of disinfectant wipes….." (Trial Day 1 at 78, 86.)  It appears that Plaintiff never actually sold any of these kits on Amazon.  (See id. at 56 [Gastwirth testimony that Plaintiff was "working to sell on Amazon"].)

Mr. Gastwirth testified that Plaintiff "was originally formed to be in the entertainment business," specifically "concert promotions."  (Id. at 17.)  In 2020, in response to the COVID-19 pandemic, Plaintiff switched to selling hand sanitizer and PPE.  (Id.)  "In 2020 the only business [Plaintiff] did was PPE business."  (Id. at 16.)  Prior to the sales at issue in this lawsuit, Plaintiff had procured hand sanitizer and masks for Safeguard.  (Id. at 56-57.)  Safeguard then "approached [Plaintiff] and asked if [Plaintiff] could get … disinfectant wipes" for Haas and KB Home.  (Id. at 56.)  Haas and KB Home had never ordered any products from Plaintiff before.  (See Stip. Facts / Dkt. 62 at 2 ["this was a test order for Haas Automation, Inc. and KB Home"].)

Given Plaintiff's new entry into this line of business in 2020, and the lack of an existing sales relationship with either Haas or KB Home, Plaintiff's estimated lost profits are too speculative to support an award of damages.[9]

e.    Prejudgment interest.

Plaintiff argues, "Since the parties' contract (the Purchase Order) did not provide a legal rate of interest, [Plaintiff] is also entitled to interest at the rate of 10 percent per year following Defendants' breach" under California Civil Code section 3289.  (Pl. Closing Br. at 15.)

Section 3289 provides that, if a party is entitled to prejudgment interest on a breach of contract claim, and the contract "does not stipulate a legal rate of interest,

---

[9] Defendants object to Exhibit 46 and Mr. Gastwirth's lost profits testimony on multiple grounds, e.g., that it was improper expert testimony and hearsay, and that Plaintiff did not provide Exhibit 46 to Defendants during discovery.  (Defs. Closing Br. at 19.)  The Court denies these objections as moot because, even if the evidence were admitted, it is insufficient to support an award of lost profits.

the obligation shall bear interest at a rate of 10 percent per annum after a breach."
Cal. Civ. Code § 3289(b).   "[U]nder California Civil Code § 3287, prejudgment
interest is recoverable in any action in which damages are certain or 'capable of
being made certain by calculation' and the right to recover such damages is vested
in the plaintiff on a particular day." Carlson Produce, LLC v. Clapper, No. 18-cv-
07195, 2020 WL 533004 at *7, 2020 U.S. Dist. LEXIS 17936 at *21 (N.D. Cal.
Feb. 3, 2020).   "Damages are deemed certain or capable of being made certain
within the provisions of subdivision (a) of section 3287 where there is essentially
no dispute between the parties concerning the basis of computation of damages if
any are recoverable but where their dispute centers on the issue of liability giving
rise to damage." Duale v. Mercedes-Benz USA, LLC, 148 Cal. App. 4th 718, 729
(2007) (citation omitted).   "In other words, prejudgment interest is awarded only
when the sum is liquidated within the meaning of the statute." Id. at 728.

"[T]he court has no discretion, but must award prejudgment interest upon
request, from the first day there exists both a breach and a liquidated claim."
Warren v. Kia Motors Am., Inc., 30 Cal. App. 5th 24, 43 (2018) (citation omitted).
However, several district courts have refused to award prejudgment interest where
the plaintiff does not provide sufficient information to calculate the award. See,
e.g., Andrade v. Arby's Rest. Grp., Inc., 225 F. Supp. 3d 1115, 1141 (N.D. Cal.
2016) ("[T]he Court received no documentation suggesting how it might calculate
the interest due to Andrade for these unpaid wages.   The Court declines to take on
Andrade's burden."); Carlson, 2020 WL 533004 at *8, 2020 U.S. Dist. LEXIS
17936 at *21-22 (declining to award prejudgment interest where the plaintiff's
briefing calculated it on a monthly rather than yearly bases and did "not explain
why it relies on a monthly calculation, or how it believes this calculation is
mathematically equivalent to the rate specified in section 3289(b)").

Here, the entirety of Plaintiff's argument about prejudgment interest is set
forth above.   Plaintiff has not stated what amount of prejudgment interest it is

27

1   seeking, suggested the date when the interest began accruing, or otherwise

2   explained how the Court should calculate such interest.  See Andrade, 225 F. Supp.

3   3d at 1141.  Moreover, Plaintiff has not explained why and when it believes the

4   amount of damages in this case became undisputed.  See Duale, 148 Cal. App. 4th

5   at 729.  Indeed, Plaintiff and Defendants disagreed over the amount of damages up

6   to and through trial, with Defendants claiming that some of the wipes were usable

7   and therefore not compensable.  The Court therefore declines to award prejudgment

8   interest.

9   **B.**    **Breach of the Implied Covenant of Good Faith and Fair Dealing.**

10      **1.**    **Applicable Law.**

11      "Every contract imposes on each party a duty of good faith and fair dealing

12   in each performance and in its enforcement."  Careau & Co. v. Sec. Pac. Bus.

13   Credit, Inc., 222 Cal. App. 3d 1371, 1393 (1990) (quoting Rest. 2d Contracts,

14   § 205).  "Simply stated, the burden imposed is that neither party will do anything

15   which will injure the right of the other to receive the benefits of the agreement."  Id.

16   (citations and quotation marks omitted).  "In essence, the covenant is implied as a

17   *supplement* to the express contractual covenants, to prevent a contracting party

18   from engaging in conduct which (while not technically transgressing the express

19   covenants) frustrates the other party's rights to the benefits of the contract."  Racine

20   & Laramie, Ltd. v. Dep't of Parks & Recreation, 11 Cal. App. 4th 1026, 1031-32

21   (1992), reh'g denied & opinion modified (Jan. 6, 1993), as modified on denial of

22   reh'g (Mar. 25, 1993).  (quoting Love v. Fire Ins. Exchange, 221 Cal. App. 3d

23   1136, 1153 (1990)).

24      If the allegations supporting a claim for breach of the implied covenant of

25   good faith and fair dealing "do not go beyond the statement of a mere contract

26   breach and, relying on the same alleged acts, simply seek the same damages or

27   other relief already claimed in a companion contract cause of action, they may be

28   disregarded as superfluous as no additional claim is actually stated."  Careau, 222

28

Cal. App. at 1395. "Thus, absent those limited cases where a breach of a consensual contract term is not claimed or alleged, the only justification for asserting a separate cause of action for breach of the implied covenant is to obtain a tort recovery." Id.

### 2.   Plaintiff Has Not Shown Entitlement to Any Additional Relief.

Defendants argue that this claim is "superfluous" because it relies on the same actions as Plaintiff's breach of contract claim. (Defs. Closing Br. at 9-10, citing Careau & Co. v. Security Pacific Business Credit, Inc., 222 Cal. App. 3d 1371, 1395 (1990)). However, Plaintiff bases this claim on actions Defendants took *after* the breach of selling unusable wipes, arguing that Defendants: (a) "refus[ed] to do anything to rectify the situation and provide [Plaintiff] with usable wipes, once [Defendant] THH discovered that no additional wipes would be ordered"; (b) refused to refund Plaintiff's money; (c) offered to test the wipes, but either never did so or never shared the results of the testing with Plaintiff; and (d) "claim[ed], for the first time after the breach ... that [Defendant] THH was in fact not the manufacturer of the disinfectant wipes and was therefore unable to provide usable wipes...." (Pl.'s Closing Br. at 7-8.)

Nevertheless, Plaintiffs have neither claimed nor shown that they are entitled to any relief other than the damages that they are already entitled to recover on the claims for breach of contract and breach of the implied warranty of merchantability. Accordingly, the Court declines to decide whether a party who breaches a contract by selling rejectable goods is required to act in good faith to attempt to rectify that breach.

### C.   Breach of an Express Warranty.

### 1.   Applicable Law.

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Cal. Com.

1   Code § 2313(1)(a).  Likewise, "Any description of the goods which is made part of

2   the basis of the bargain creates an express warranty that the goods shall conform to

3   the description."  Cal. Com. Code § 2313(1)(b).

4       "It is not necessary to the creation of an express warranty that the seller use

5   formal words such as 'warrant' or 'guarantee' or that he have a specific intention to

6   make a warranty, but an affirmation merely of the value of the goods or a statement

7   purporting to be merely the seller's opinion or commendation of the goods does not

8   create a warranty."  Cal. Com. Code § 2313(2).

9       **2.      Plaintiff Has Not Shown that Defendants Made Any Express**

10          **Warranty.**

11      Defendant argues that "there was no express warranty, nor was there a

12  product specification or description other tha[n] the designation of sanitary wipes."

13  (Defs. Closing Br. at 11.)  Plaintiff does not explain what specific oral or written

14  statement by Defendant Zielomski (or any other person) forms the basis of its

15  express warranty claim.  Citing the parties' stipulated facts, Plaintiff argues,

16  "Plaintiff negotiated with Defendants for the purchase of disinfectant wipes for

17  Plaintiff's customers. … During the course of the negotiations, Defendants affirmed

18  the fact that the disinfectant wipes were of good quality and sufficient for use by

19  Plaintiff's customers."  (Pl. Closing Br. at 8.)  The only stipulated facts relevant to

20  Plaintiff's assertions are that Plaintiff "negotiat[ed] with Defendant Rick Zielomski

21  … for the purchase of disinfectant wipes"; that Defendant Zielomski's name was on

22  an SDS "stating that the product was safe"; and "the disinfectant wipes … did not

23  meet specifications and were moldy and unusable…."  (Stip. Facts / Dkt. 62 at 2-3.)

24      The allegation that the wipes were "unusable" for their intended purpose can

25  support a claim for the breach of the implied warranty of merchantability, as

26  discussed above.  See Viggiano v. Hansen Nat. Corp., 944 F. Supp. 2d 877, 896

27  (C.D. Cal. 2013) ("A "defendant['s] liability for an implied warranty does not

28  depend upon any specific conduct or promise on [its] part, but instead turns upon

30

1    whether the[ ] product is merchantable under the code.") (quoting <u>Hauter v.</u>

2    <u>Zogarts</u>, 14 Cal. 3d 104, 117 (1975)).  An express warranty, in contrast, requires

3    proof of a specific "affirmation of fact or promise or … description of its goods…."

4    <u>Id.</u> at 893.  To the extent Plaintiff is claiming that the wipes did not "disinfect[]" as

5    intended, or that they were not "safe," this overlaps with its claim for breach of the

6    implied warranty of merchantability.  Because Plaintiff does not point to any other

7    statements Defendant Zielomski or others made about the wipes' "specifications,"

8    this claim fails.

9    **D.    <u>Negligent Interference with Prospective Economic Relations.</u>**

10       In support of this claim, Plaintiff argues that Defendants knew Plaintiff's

11   relationship with Safeguard "would be disrupted if [Defendants] failed to act with

12   reasonable care in providing usable disinfectant wipes," and Defendants disrupted

13   this relationship "by providing wipes that were moldy and unusable."  (Pl. Closing

14   Br. at 13-14.)  Defendants argue that this claim fails because it is "between

15   contracting parties" and "the California Commercial Code and the UCC … provide

16   adequate protection."  (Defs. Closing Br. at 18; <u>see also id.</u> at 20 [arguing "the

17   injury [was] part of the plaintiff's ordinary business risk"].)

18       **1.    Applicable Law.**

19      A plaintiff asserting a claim for negligent interference with prospective

20   economic relations "must show that the defendant knowingly interfered with an

21   economic relationship between the plaintiff and some third party, [which carries]

22   the probability of future economic benefit to the plaintiff."  <u>Ixchel Pharma, LLC v.</u>

23   <u>Biogen, Inc.</u>, 9 Cal. 5th 1130, 1141 (2020) (citations and quotation marks omitted).

24      "Where the suit is between a non-performing seller and an aggrieved buyer

25   and the injury consists of damage to the goods themselves and the costs of repair of

26   such damage or a loss of profits that the deal had been expected to yield to the

27   buyer, it" is "sensible to limit the buyer's rights to those provided by the Uniform

28   Commercial Code...."  <u>S.M. Wilson & Co. v. Smith Int'l, Inc.</u>, 587 F.2d 1363, 1376

31

(9th Cir. 1978).  "California law achieves this result by limiting the type of losses recoverable under an action in negligence.  Economic losses are not recoverable under negligence."  Id. (citing Seely v. White Motor Co., 63 Cal. 2d 9, 18 (1965)).

This principle is often referred to as the "economic loss rule," which "generally bars tort claims based on contract breaches, 'thereby limiting contracting parties to contract damages.'"  UMG Recordings, Inc. v. Glob. Eagle Ent., Inc., 117 F. Supp. 3d 1092, 1103 (C.D. Cal. 2015) (citation omitted); see also Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (2020), Comment b. ("[I]f plaintiff and defendant have a valid contract, monetary harm caused by the defendant's negligent performance of it is generally not actionable in tort. … When a party's negligence in performing or negotiating a contract causes economic loss to the counterparty, remedies are determined by other bodies of law: principally the law of contract….").  "A breach of contract is tortious only when some independent duty arising from tort law is violated."  UMG Recordings, 117 F. Supp. 3d at 1103.

Additionally, "a plaintiff seeking to recover damages for interference with prospective economic advantage must plead as an element of the claim that the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself.'"  Ixchel Pharma, LLC v. Biogen, Inc., 9 Cal. 5th 1130, 1142 (2020) (quoting Della Penna v. Toyota Motor Sales, USA, Inc., 11 Cal. 4th 376, 393 (1995)).  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  Id. (quoting Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1159 (2003)).

**2.     Plaintiff Has Not Shown It Is Entitled to Recover on This Claim.**

The only behavior Plaintiff points to in support of this claim is Defendants' failure to deliver usable disinfectant wipes.  (Pl.'s Closing Br. at 12-14.)  This is the same behavior Plaintiff relies on to support its claims for breach of contract and breach of the implied warranty of merchantability.  (Id. at 5-6, 9-10.)  As discussed

above, Plaintiff already has a remedy under these theories.  Recovery in tort for the same behavior is therefore barred by the economic loss rule.  See UMG Recordings, 117 F. Supp. 3d at 1103.  Moreover, Plaintiff does not point to any independent wrongful act to support this claim.  See Ixchel Pharma, 9 Cal. 5th at 1142.  Accordingly, Plaintiff has not shown that it is entitled to relief on this claim.

**E.    Unfair Competition Law ("UCL").**

Plaintiff argues that Defendants committed "fraud" because they "knew that the SDS provided was for the wrong item" and "intended for [Plaintiff] to rely on the SDS…."  (Pl. Closing Br. at 11.)  Plaintiff further argues that Defendants "engaged in unfair and fraudulent practices by: 1) pretending that they were in fact the manufacturers of the disinfectant wipes, up until the point that that wipes were found to be moldy; 2) using a fraudulent [SDS] while essentially claiming that it was industry practice to do so … ; 3) failing to rectify the fact that unusable, moldy wipes were provided to [Plaintiff] (and therefore, it's [sic] customers)."  (Id. at 11-12.)  Plaintiff seeks "restitution and injunctive relief" in the form of a "full refund." (Id. at 12.)  Defendants respond, "There has been absolutely no evidence whatsoever … of any 'fraudulent business act or practice'" or "that any Defendant committed any act that was 'unfair.'"  (Defs. Closing Br. at 14.)

**1.    Applicable Law.**

"The purpose of the UCL is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  Paulus v. Bob Lynch Ford, Inc., 139 Cal. App. 4th 659, 676 (2006) (citation and quotation marks omitted).  Unfair competition is defined, in relevant part, as "any unlawful, unfair or fraudulent business act or practice…."  Cal. Bus. & Prof. Code § 17200.

"Pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and Guaranty Trust Co. of New York v. York, 326 U.S. 99 (1945), we hold that federal courts must apply equitable principles derived from federal common law to claims for equitable restitution under California's Unfair Competition Law ("UCL")…."

1    Sonner v. Premier Nutrition Corp., 971 F.3d 834, 837 (9th Cir. 2020) (parallel

2    citations omitted).  "Under these principles, [a plaintiff] must establish that [it]

3    lacks an adequate remedy at law before securing equitable restitution for past harm

4    under the UCL…."  Id. at 844.

5         "In order to entertain a request for equitable relief, a district court must have

6    equitable jurisdiction, which can only exist under federal common law if the

7    plaintiff has no adequate legal remedy."  Guzman v. Polaris Indus. Inc., 49 F.4th

8    1308, 1313 (9th Cir. 2022) (citing Sonner, 971 F.3d at 843-44).  Where a federal

9    court lacks equitable jurisdiction over a UCL claim, because the plaintiff has an

10   adequate remedy at law, the court can "not … make a merits determination as to

11   liability" and should "dismiss[] [the] UCL claim without prejudice to refiling the

12   same claim in state court."  Id. at 1314 (reversing summary judgment for

13   defendants and directing the district court to enter a dismissal without prejudice for

14   lack of equitable jurisdiction).

15        **2.    Analysis.**

16        Plaintiff has an adequate remedy at law, namely the claims for breach of

17   contract and breach of the implied warranty of merchantability discussed above.

18   See, e.g., Williams v. Apple, Inc., No. 19-cv-04700, 2020 WL 6743911 at *9, 2020

19   U.S. Dist. LEXIS 215046 at *24-25 (N.D. Cal. Nov. 17, 2020) (dismissing UCL

20   claim that was duplicative of claim for breach of contract for money damages).  In

21   those claims, Plaintiff seeks the same "full refund" as monetary damages that it

22   seeks as equitable relief under the UCL.  See Sonner, 971 F.3d at 844 (finding the

23   plaintiff had an adequate remedy at law where she "conceded that she seeks the

24   same sum in equitable restitution as 'a full refund of the purchase price' … as she

25   requested in damages to compensate her for the same past harm," and she "fail[ed]

26   to explain how the same amount of money for the exact same harm is inadequate or

27   incomplete").

28        Accordingly, this claim should be dismissed without prejudice for lack of

equitable jurisdiction.

## IV.

## CONCLUSION

Based on the foregoing, IT IS HEREBY ORDERED that Judgment shall be entered :

1.   for Defendant Zielomski on all claims;

2.   for Plaintiff and against Defendant THH in the amount of $49,568.00 on the claims for breach of contract and breach of the implied warranty of merchantability;

3.   for Defendant THH and against Plaintiff on the claims for breach of express warranty, breach of the implied covenant of good faith and fair dealing, and negligent interference with prospective economic relations; and

4.   dismissing the UCL claim without prejudice for lack of equitable jurisdiction.

DATED:  November 15, 2022

_Karen E. Scott_
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE